**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

MORRIS L. BARNES,                     *
                                      *
    **Plaintiff,**                    *
                                      *
vs.                                   *     **CIVIL ACTION NO. 16-00096-B**
                                      *
NANCY BERRYHILL,[1]                   *
Acting Commissioner of Social         *
Security,                             *
                                      *
    **Defendant.**                    *

<u>ORDER</u>

    Plaintiff Morris Barnes (hereinafter "Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.,* and 1381, *et seq.* On May 25, 2017, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 15). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Upon careful consideration

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d), <u>Federal Rules of Civil Procedure</u>, Nancy Berryhill should be substituted for Carolyn W. Colvin as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.  Procedural History

Plaintiff filed his applications for disability, disability insurance benefits, and supplemental security income on March 23, 2010, alleging disability beginning on April 16, 2009, based on "left knee problems."  (Tr. 129-130, 377).  Plaintiff's application was denied and upon timely request, he was granted an administrative hearing on March 16, 2012, before Administrative Law Judge Linda Helm (hereinafter "ALJ").  (Id. at 89).  Plaintiff attended the hearing with his counsel and provided testimony related to his claims.  (Id. at 91-121).  A vocational expert ("VE") also appeared at the hearing and provided testimony.  (Id. at 121-127).  On June 18, 2012, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 42-53).  In an opinion dated August 28, 2013, the Appeals Council remanded this matter and instructed the ALJ to obtain additional evidence regarding Plaintiff's left knee impairment, such a consultative orthopedic examination and source statement, further evaluate Plaintiff's subjective complaints, and give further consideration to Plaintiff's maximum residual functional capacity during the entire period at

issue.[2]  (Id. at 158-160).

Following remand, a second hearing was held on March 13, 2014. Plaintiff attended the hearing with his counsel and provided additional testimony. A medical expert and vocational expert also attended the hearing and offered testimony.[3]  (Id. at 58-65, 82-85). The ALJ issued an unfavorable decision on June 10, 2014. (Id. at 21-36, 42-88). The Appeals Council denied Plaintiff's request for review on February 5, 2016. (Id. at 1). Therefore, the ALJ's decision dated June 10, 2014, became the final decision of the Commissioner.

Having exhausted his administrative remedies, Plaintiff timely filed the present civil action. (Doc. 1). Oral argument was conducted on June 1, 2017, before the undersigned Magistrate Judge (Doc. 17), and the parties agree that this case is now

---

[2] The Appeals Council also found that the ALJ's opinion was internally inconsistent because, while the ALJ found that Plaintiff's statements regarding his activities and abilities were generally credible, she found that he was capable of standing and walking a total of two hours — 15 to 30 minutes at one time, but Plaintiff testified that he could only walk five minutes. Additionally, the Appeals Council found that, while the ALJ concluded that Dr. Otis Harrison's opinion that Plaintiff is limited in his standing and walking and cannot engage in work-related activities on a regular basis was not consistent with his own treatment notes, Dr. Harrison's opinion was consistent with Dr. Pearsall and Dr. Lane's treatment notes indicating that Plaintiff was unable to work due to difficulty walking. (Id. at 158-160). The Appeals Council sought clarification with respect to this issue.

[3] The medical expert, Dr. Arthur Lorber, M.D., appeared by telephone. (Id. at 49).

ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  Issue on Appeal

> **Whether the ALJ erred in assigning little weight to the opinions of Plaintiff's treating physician, Dr. Otis Harrison, M.D.?**

## III. Background

### A.  Plaintiff's testimony

Plaintiff was born on April 11, 1972, and was thirty-nine years of age at the time of his administrative hearing on March 16, 2012. (Tr. 89, 96, 377). Plaintiff alleges that he became disabled on April 16, 2009, based on "left knee problems." (Id. at 129-130, 377).

Plaintiff completed the eleventh grade and pursued his GED; however, he left the program after getting a job. (Id. at 98-99). Plaintiff's past work includes shipyard welder, construction laborer, ripsaw operator, and production assembler. (Id. at 82, 101-105, 122). In 2006, following partial medial meniscectomy surgeries on his left knee, he returned to work as a heavy laborer. (Id. at 58, 106). In April 2009, following a boating accident in which he reinjured his left knee, Plaintiff's employer placed him on light duty and sent him for an MRI. (Id. at 100, 105, 451).

According to Plaintiff, he cannot work now due to pain, swelling, and arthritis in his left knee, which causes him to

4

barely be able to walk. (Id. at 106). Plaintiff testified that he takes Lortab and uses creams and a stretch machine for his knee pain. (Id. at 106-107). Plaintiff received worker's compensation payments for his knee and a lump sum settlement of $125,000. (Id. at 105).

## B. ALJ's Decision

In her decision issued on June 10, 2014, the ALJ found that Plaintiff has the severe impairments of degenerative joint disease of the left knee, diabetes mellitus, and obesity.[4] (Tr. 23). The ALJ further found that, while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Id. at 25-26). The ALJ determined that Plaintiff has the residual functional capacity to perform a reduced range of light work, subject to the following restrictions: Plaintiff can lift/carry no more than twenty

---

[4] The ALJ found that Plaintiff's anxiety, hypertension, and hyperlipidemia/hypercholesterolemia were not severe because the record fails to suggest that the Plaintiff has received ongoing treatment for the conditions, has experienced ongoing difficulties with the specific symptoms associated with the conditions, has experienced the persistent manifestation of the objective signs of the conditions, or that these conditions have imposed more than minimal functional limitations on the Plaintiff. (Tr. 25). The ALJ further determined that Plaintiff has no documented medically determinable impairment with respect to his complaints of back pain. (Id.).

pounds occasionally and ten pounds frequently; he can stand/walk no more than thirty minutes at a time and no more than two hours in an eight-hour workday; he needs to be able to use a cane for prolonged walking; sitting is unrestricted with the usual breaks; he can never climb ladders, scaffolding, or ropes, kneel, crawl, or work around unprotected heights or in temperature extremes; and he can only occasionally climb stairs and ramps, bend, stoop, crouch, and operate moving equipment. (Id. at 25). Utilizing the testimony of a vocational expert, the ALJ concluded that Plaintiff cannot perform his past relevant work; however, he can perform the jobs of bench assembler, surveillance system monitor, and call-out operator. (Id. at 36).

### C. Medical Evidence

The medical records reflect that Plaintiff reported injuring his left knee in a boating accident in April 2009 and that he was treated by the Industrial Medical Clinic of Mobile. (Id. at 450-455). He was initially diagnosed with lumbar region strain and left knee strain. (Id.). Plaintiff was placed on restricted duty, which included no climbing, no squatting on the left knee, and no lifting over 20 pounds. (Id.). An MRI of Plaintiff's left knee revealed previous medial meniscectomy, tear of lateral meniscus, chrondromalacic change of the patella, mild change of degenerative joint disease, and small

structure in the suprapatellar bursa.  (Id. at 454).

Plaintiff was seen by Dr. Clayton Lane, M.D., on April 28, 2009, and reported left knee pain.  (Id. at 455).  On exam, Dr. Lane observed that Plaintiff had moderate tenderness over the lateral joint line, negative Lachman, negative drawer, negative patellar grind, and positive McMurray's laterally.  (Id.).  Dr. Lane diagnosed Plaintiff with left knee pain and left knee anterior horn lateral meniscus tear and prescribed Mobic and physical therapy three times a week.  (Id.).  During Plaintiff's May 12, 2009 visit, he reported that physical therapy made his pain worse.  (Id. at 457).  Dr. Lane prescribed Lortab and noted that Plaintiff would be scheduled for an arthroscopic partial lateral meniscectomy with chondroplasty of the patellofemoral joint.  (Id.).  On May 20, 2009, Dr. Lane performed arthroscopic partial medial and lateral meniscectomies with microfracture patella to address the meniscus tear and assess the chondral damage.  (Id. at 458).  Plaintiff was placed in a hinged knee brace, and his range of motion was 0 to 30.  He was set up with a home CPM for range of motion and was instructed to remain completely non-weight bearing.  (Id. at 458-59).

Dr. Lane's treatment records dated May 28, 2009 reflect that Plaintiff reported 8/10 pain and was placed in a hinged knee brace 0 to 20 degrees range of motion.  Additionally, Dr. Lane prescribed physical therapy three times a week for six

weeks and noted, "I am keeping him out of work." (Id. at 461).

By July 2009, diagnostic imaging of Plaintiff's left knee showed

no evidence of fracture or other pathology, and Dr. Lane's

treatment notes dated July 7, 2009, reflect that Plaintiff had

an "excellent range of motion," although he reported "catching"

under the kneecap with a certain motion. (Id. at 463). During

Plaintiff's July 28, 2009 visit, he had 0 to 140 degrees of knee

flexion but experienced pain under the patella with that range

of motion. (Id. at 464). He also had mild crepitus but no

significant locking or mechanical black to motion. X-rays

showed no evidence of loose body or fracture. (Id.). Dr. Lane

prescribed Lortab 7.5 and four additional weeks of physical

therapy, noting that he was going to keep Plaintiff out of work

for three weeks and have him pre-approved for a possible Synvisc

injection. Dr. Lane discussed getting Plaintiff's pain to a

manageable level and getting him back to a reasonable level of

activity. (Id.)

Dr. Lane's treatment notes for August 20, 2009, reflect

that on physical exam, Plaintiff had crepitus on range of motion

in the patellofemoral joint and that he still had tenderness

over the medial and lateral side of the patellofemoral joint and

pain with resisted knee extension. His x-rays were unchanged.

Lane changed Plaintiff's medication to Mobic and released him to

begin "light duty with no prolonged standing, no lifting, and no

climbing." (Id. at 465).

During Plaintiff's August 31, 2009 visit, he reported that his knee gave out while in the restroom at work, and as a result, he twisted his left knee and fell. (Id. at 466). He also reported 10/10 pain and had positive extension of the knee upon examination. (Id.). Dr. Lane scheduled an MRI of Plaintiff's left knee for September 28, 2009, and the MRI revealed an 8.7 mm. loose body in the lateral gutter and a 13 x 12 mm. patellar chondral defect. (Id. at 469). On exam, Plaintiff had "exquisite tenderness over the lateral side of the patellofemoral joint," was "tender over the superomedial patella," had "crepitus on range of motion," and resisted "full flexion of the knee." (Id. at 469). Because Plaintiff did not have any fill of the chondral defect with scar tissue and had a loose body in the knee, Dr. Lane recommended revision surgery. (Id.) The final treatment record from Dr. Lane, dated October 9, 2009, reflects that Plaintiff's physical exam was unchanged and that based on Plaintiff's report that he could not walk the distance from his car to his employment, Dr. Lane would keep him out of work. (Id. at 470). The treatment notes also reflect that Plaintiff was given Lortab and Ativan and that he was awaiting surgery. (Id.).

From November 2009 to November 2010, Plaintiff was treated

by Dr. Albert Pearsall, M.D.[5]  Notes from Plaintiff's November 23, 2009, visit reflect that Plaintiff had returned to work but continued to have swelling pain and difficulty walking, was using a crutch, and reported that he was not on any medications. (Id. at 491).  On exam, Plaintiff had 0-120 degree extension with pain around the patella.  He had medial tenderness over the plateau but not over the meniscus.  He had no lateral joint line tenderness, negative Lachman and negative posterior drawer. (Id.).  Dr. Pearsall recommended a valgus unloading brace prior to any surgical intervention to see if it would help alleviate the medial joint line symptoms. (Id. at 492).  Dr. Pearsall restricted Plaintiff from work and prescribed Lortab and Soma. (Id.).  His treatment notes reflect that Plaintiff received the unloading brace on December 19, 2019, and was instructed to wear the brace for two weeks.  Dr. Pearsall prescribed forty Lortab 10, with no refills.  (Id. at 489).  During Plaintiff's January 4, 2010 visit, he reported that the valgus unloading brace had helped him minimally.  On examination, Dr. Pearsall noted that Plaintiff appeared to have lateral joint line tenderness and a positive lateral McMurray. (Id. at 488).  Dr. Pearsall advised Plaintiff that he would attempt to do an autologous mosaicplasty through a miniarthrotomy for his patella, explaining the risks

---

[5] Dr. Pearsall noted that he had previously treated Plaintiff prior to his November 2009 visit.  (Tr. 491).

and benefits of the procedure. (Id.)

On January 27, 2010, Plaintiff underwent a left knee video arthroscopy, synovectomy and open patellar mosaicplasty with five plugs. (Id. at 479). Eight days later, Plaintiff had an office visit with Carmen May, CRNP, and could flex his knee approximately 70 degrees, had moderate swelling of the left knee, and placed his pain at 8/10. (Id. at 487). He was prescribed Ted Hose for swelling in his left lower extremity, as well as Lortab, Soma, and Mobic, and instructed to continue physical therapy for left knee rehabilitation and to use the CPM machine at home. (Id.).

On March 4, 2010, Dr. Pearsall diagnosed Plaintiff with arthrofibrosis of the left knee and patellar inferior scarring, as well as scarring around the joint. (Id. at 486). Dr. Pearsall opined that Plaintiff needed an arthroscopy for scar resection, debridement and elevation of the patellar tendon, an assessment of the mosaic plugs, and aggressive manipulation under anesthesia. Dr. Pearsall recommended hyaluronic acid injections for three weeks to assess healing of the plugs and noted that Plaintiff could try physical therapy to see if there was improvement. (Id.). At Plaintiff's March 15, 2010 visit, he reported crepitus and continued patellofemoral pain, and his range of motion was 0 to about 75 degrees. (Id. at 483). Dr. Pearsall noted that Plaintiff had some incongruous plugs and

that some scar tissue had formed.  He again opined that Plaintiff would benefit from arthroscopy. (Id.).  Dr. Pearsall's treatment notes dated April 5, 2010, reflect that Plaintiff was three months status post left patellar mosaicplasty, and while Plaintiff was still having some crepitus on the medial side of his knees and reported difficulty walking and the use of a cane, his flexion was up to 100 degrees.  Dr. Pearsall prescribed Lortab and Soma, noting that Plaintiff was awaiting approval from Worker's Compensation for the recommended procedure. (Id. at 482).

Dr. Pearsall's treatment notes in June and July 2010 reflect that Worker's Compensation officials had secured a second opinion regarding the recommended procedure and that Dr. Patton, who rendered the second opinion, had concurred with Dr. Pearsall's assessment that Plaintiff needed a follow-up knee arthroscopy for synovectomy, scar tissue debridement, and possible shaving of the plugs. (Id. at 476-479).  It was noted that Plaintiff was walking with a significant limp and had some back pain.  Plaintiff was given a cane and prescribed Lortab and Soma until he could be approved for surgery. (Id.).

Dr. Pearsall's last two treatment records dated September 17, 2010, and November 22, 2010, reflect that Plaintiff still had pain and discomfort, that he had settled his Worker's Compensation claim, and that he would have to pay for his

surgery as he no longer had insurance because of the settlement. Dr. Pearsall suggested that Plaintiff find a pain management doctor and noted that Plaintiff had discussed disability with him and that he had directed Plaintiff to get the forms to him so that he could evaluate and complete them. (Id. at 474-475). During the November visit, Plaintiff was prescribed a two month supply of Lortab and Soma and advised to return as needed. (Id. at 474). The record does not contain any disability forms completed by Dr. Pearsall.

The record reflects that, in 2011 and 2012, Plaintiff was regularly treated by Otis Harrison, M.D. and others at Franklin Primary Health Center for various ailments including complaints of left knee pain. (Id. at 496-498, 503-507, 511-519, 523-528, 534-555). During a February 2011 visit, Plaintiff reported knee pain and swelling, back pain, and muscle spams. On examination, Plaintiff had pain on range of motion in his left knee and back. (Id. at 500). X-rays taken on October 17, 2011, revealed no abnormality on Plaintiff's lumbar spine and arthritic changes of the patellofemoral joint in Plaintiff's left knee. No fracture or destructive bony lesion was seen. (Id. at 507). Treatment notes dated November 21, 2011, reflect that Plaintiff had a history of knee pain and a history of four surgeries. On examination, Plaintiff reported pain in his left knee on range of motion. (Id. at 503). He was diagnosed with degenerative

joint disease-left knee, anxiety, high blood pressure and hyperlipidemia. (Id. at 504). Plaintiff was prescribed Lortab and Mobic for his knee pain. (Id. at 506). Treatment notes from January 23, 2012, reflect that Plaintiff complained of flea bites. No abnormalities were noted on an exam of his musculoskeletal system. (Id. at 516). Plaintiff was diagnosed with left knee pain, flea bites, degenerative joint disease, anxiety, high blood pressure, and hyperlipidemia, and his medications were continued. (Id. at 517). Treatment records from Plaintiff's April 6, 2012, office visit reflect that no abnormalities were noted on an examination of his musculoskeletal system. On April 30, 2012, back pain was noted on examination of Plaintiff's range of motion. (Id. at 525-528). In both instances, his diagnoses and treatment plan remained largely unchanged. (Id.).

In April 2012, Dr. Harrison completed a Clinical Assessment of Pain form, opining that Plaintiff's pain was intractable and virtually incapacitating, that physical activity would increase his pain to such an extent that bed rest would be necessary, and that he would be totally restricted and unable to function at a productive level of work because of pain. (Id. at 518-519). Dr. Harrison also opined that Plaintiff could not engage in any form of gainful employment over a eight hour work day, in a forty-hour workweek, without missing more than two days of work

per month or experiencing frequent interruptions to his work routine due to symptoms. (Id.).

In July 2012, Plaintiff was evaluated by Dr. Najma Kayani at the Franklin clinic. (Id. at 521). Plaintiff's chronic problems were listed as hypercholesterolemia, hypertension, erectile dysfunction, degeneration of lumbar or lumbosacral intervertebrae, and pain in joint involving lower leg. (Id.). On examination, Plaintiff's gait was normal, and he had normal mobility and curvature. (Id. at 523).

The records also reflect that Plaintiff was treated by Dr. Harrison four times in 2013 and 2014, namely June 2013, September 2013, November 2013, and January 2014. (Id. at 547). The records reflect that Plaintiff sometimes reported difficulty walking and joint pain, and sometimes denied such. (Id. at 547-556). Musculoskeletal examinations often revealed normal gait, normal station and stability. (Id.). In December 2013, Dr. Harrison prepared a Clinical Assessment of Pain form that essentially mirrored the one he prepared in April 2012. (Id. at 539).

On November 11, 2013, Dr. William Crotwell, III, M.D., conducted an orthopedic consultative examination at the request of the Agency. (Id. at 536). On examination, Dr. Crotwell noted that Plaintiff ambulated with a cane, reported that he took Lortab, and that he was able to get up and down from the

table and move about without difficulty. Dr. Crotwell also observed that Plaintiff's toe and heel walk were normal, that his straight leg raise sitting - right and left - was 90 with no pain, that his sensory examination was essentially normal, that his motor function was 5/5, and that his reflexes were +2. (Id.). He also observed Plaintiff's painful range of motion of the left knee at -5 to 110 and crepitus underneath the patella. According to Dr. Crotwell, diagnostic imaging of Plaintiff's knee showed patellofemoral arthritis and mild joint space arthritis with some mild narrowing of the medial joint space and more patellofemoral arthritis.

Dr. Crotwell's impression was "postop video of the left knee with some moderate arthritis of the knee and patellofemoral joint" and "postop open microfracture technique and mosaic technique for the patella with residual patellofemoral arthritis, moderate to severe." (Id. at 537). Dr. Crotwell recommended scoping Plaintiff's left knee and shaving the patella down to a smoother surface. He opined that Plaintiff could perform sedentary jobs, that he should avoid excessive walking, inclines, and stairs, and that he should perform no bending, stooping, crawling or excessive torqueing of the leg. (Id.).

Dr. Crotwell completed a physical capacities evaluation dated November 11, 2013, and his findings included that

Plaintiff could sit for eight hours total during an eight hour work day, could stand for six hours total during an eight hour work day, could work for four hours during an eight hour work day, could sit for one hour at one time, could stand for one hour total at one time, could walk for one hour total at one time, could continuously lift up to ten pounds, could frequently lift eleven to twenty pounds, and could occasionally lift twenty-one to twenty-five pounds. (Id. at 538).

The final medical evidence in the record is the testimony of Dr. Arthur Lorber, M.D., who offered testimony at Plaintiff's second administrative hearing. (Id. at 49-65). Dr. Lorber testified that he had reviewed Plaintiff's medical records, and during the hearing, he elicited additional information from Plaintiff. He opined that Plaintiff can stand/walk for two hours in a day for 30 minutes at a time and that he has no restrictions on his ability to sit. He also opined that Plaintiff cannot climb ladders, ropes, or scaffolds, that he can occasionally ascend or descend stairs or ramps, that he can occasionally stoop or crouch, that he can occasionally work around moving machinery, that he cannot kneel, crawl, or work around unprotected heights, and that he may use a cane for prolonged walking. (Id. at 63). Dr. Lorber opined that, based upon his experience with individuals having a similar degree of pathology, Plaintiff can productively perform employment

activities under the restrictions described.  (Id. at 65).  He also opined that he had considered the effect of Plaintiff's obesity on his knee condition, that his knee condition can be expected to deteriorate with time, and that his residual functional capacity will likewise erode.  (Id. at 62).  He also opined that Plaintiff would probably not be able to continue to perform even sedentary work for more than a few years.  (Id.).

Dr. Lorber disagreed with Dr. Crotwell's opinion regarding Plaintiff's residual functional capacity because he did not believe that Plaintiff could walk for four hours a day nor stand for six hours a day, given his left knee impairment.  Dr. Lorber also disagreed with Dr. Harrison's opinion that Plaintiff's pain is so significant that it would interfere with all work activity.  (Id. at 63).  According to Dr. Lorber, Plaintiff's activity level and his usage of narcotic medication did not suggest a situation of extreme pain.  (Id.).  He also opined that practitioners such as Dr. Harrison, who are not specialists in orthopedic medicine, tend to develop relationships with their patients and become biased advocates for them.  (Id. at 64).

## IV. Standard of Review

An individual who applies for Social Security disability benefits must prove his or her disability.  20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this

burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[6] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be

---

[6] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

affirmed if they are based upon substantial evidence. <u>Brown v.</u> <u>Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v.</u> <u>Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F. 2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**V.   Discussion**

> **A. The ALJ did not err in assigning little weight to the opinions of Plaintiff's treating physician, Dr. Otis Harrison, M.D.**

In the case *sub judice*, Plaintiff argues that the ALJ erred in assigning little weight to the opinions of his treating physician, Dr. Harrison, who opined that Plaintiff's pain was intractable and virtually incapacitating, that physical activity would increase his pain to such an extent that bed rest would be necessary, and that Plaintiff's pain would fully restrict him, making him unable to function at a productive level of work such that he could not engage in any form of gainful activity on a

21

repetitive, competitive, and productive basis over an eight-hour workday. (Tr. 539). The ALJ rejected these opinions, and found as follows:

> I assign little weight to Dr. Harrison's clinical assessment of pain forms in that he is an internal medicine physician, but not a specialist in orthopedic medicine. Also, Dr. Harrison's conclusions are not supported by physical examination findings contained in his own treatment records, which failed to also delineate specific functional limitations for the claimant. Dr. Harrison's notations often illustrated the claimant's normal gait; normal station and stability; normal muscle strength and tone; normal sensory exam; and symmetrical and equal bilateral deep tendon reflexes. Moreover, Dr. Harrison's treatment notations did not describe pain existing at levels described in the clinical assessment of pain forms, nor did they indicate that the claimant would have difficulty sustaining employment or experience excessive absenteeism. While Dr. Harrison saw the claimant on a fairly regular basis at Franklin Primary Health Center, he did not evaluate him at that facility after early July 2012, and he evaluated the claimant on only four occasions between June 2013 and January 2014 at Harrison Primary Health Clinic. Additionally, while I acknowledge the claimant's significant knee pathology and resulting symptomatology, [I] cannot additionally ignore the failure of the claimant to obtain further treatment with an orthopedic specialist after November 2010. The record suggests that the claimant obtained a substantial settlement for his Worker's Compensation claim, but there is no indication from the record that he attempted to pursue the last recommended orthopedic surgical procedure in an attempt to mitigate his alleged symptomatology. In fact, the claimant's last documented orthopedic treatment is commensurate with the approximate time frame of his Worker's Compensation settlement. The claimant's failure to continue to receive specific orthopedic treatment, or treatment with a pain management specialist, further supports a finding that Dr. Harrison's clinical assessment of pain forms should be granted little weight.

(Id. at 29).

The undersigned finds that the ALJ had good cause for assigning little weight to the opinions contained in Dr. Harrison's pain assessment forms. As part of the disability determination process, the ALJ is tasked with weighing the opinions and findings of treating, examining, and non-examining physicians. In reaching a decision, the ALJ must specify the weight given to different medical opinions and the reasons for doing so. See Winschel v. Commissioner of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011). The failure to do so is reversible error. See Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, *4, 2009 WL 413541, *1 (M.D. Fla. 2009).

When weighing the opinion of a treating physician, the ALJ must give the opinions "substantial weight," unless good cause exists for not doing so. Costigan v. Commissioner, Soc. Sec. Admin., 2015 U.S. App. LEXIS 2827, *10, 2015 WL 795089, *4 (11th Cir. Feb. 26, 2015) (citing Crawford v. Commissioner of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004) and Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985)). The opinion of "a one-time examining physician — or psychologist," on the other hand, is not entitled to the same deference as a treating physician. Petty v. Astrue, 2010 U.S. Dist. LEXIS 24516, *50, 2010 WL 989605, *14 (N.D. Fla. Feb. 18, 2010) (citing Crawford,

363 F.3d at 1160). An ALJ is also "required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'" Milner v. Barnhart, 275 Fed. Appx. 947, 948 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1527(f)(2)(i)). "The ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources." Id. (citing Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991)).

Whether considering the opinions of treating, examining, or non-examining physicians, good cause exists to discredit the testimony of *any* medical source when it is contrary to or unsupported by the evidence of record. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004). "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence." Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, *8, 2012 WL 3155570, *3 (M.D. Ala. 2012). The ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion." Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (citation omitted); Adamo v. Commissioner of Soc. Sec., 365 Fed. Appx. 209, 212 (11th Cir. 2010) (The ALJ may reject any medical

opinion if the evidence supports a contrary finding.).

In the present case, while the record demonstrates that Plaintiff has degenerative disease or arthritis in his left knee, that his treatment has included four surgeries, physical therapy, and medication such as Lortab and Mobic, and that doctors have concluded that he would benefit from another procedure to scope his left knee and shave/smooth the patella, neither Dr. Harrison's treatment records nor the remaining evidence of record supports the debilitating pain and extreme restrictions contained in Dr. Harrison's pain forms. As detailed above, Dr. Harrison's treatment notes reflect that, despite Plaintiff's reports of pain in his left knee (id. at 525-534, 547), his physical examinations also revealed repeated instances of normal gait, station, stability, strength, range of motion, as well as denials of difficulty walking or rising from a sitting position or balance problems. (Id. at 548-52). Additionally, Dr. Harrison's treatment notes reflect that his treatment of Plaintiff consisted mostly of controlled dosages of Lortab and Mobic. (Id. at 506). Further, the treatment records reflect that while Plaintiff regularly saw Dr. Harrison in 2011 and 2012, he had three office visits in 2013, and one in 2014. The bottom line is that there is nothing in Dr. Harrison's treatment records that supports his opinion that Plaintiff's pain is intractable such that Plaintiff is totally restricted

and unable to function at a productive level of work.

Dr. Harrison's extreme limitations are also not supported by the other record evidence. As previously noted, Dr. Lane performed an arthroscopic partial medial and lateral meniscectomies with microfracture in May 2009 after Plaintiff re-injured his left knee in a boating incident in 2009. (Id. at 458). While Dr. Lane initially restricted Plaintiff from work in connection with the surgery, by August 20, 2009, Plaintiff had improved, and Dr. Lane released him to "light duty" with no prolonged standing, no lifting, and no climbing. (Id. at 465). In late August 2009, Plaintiff reported falling in the restroom at work and twisting his left knee. (Id. at 466). An MRI revealed an 8.7 mm loose body in the lateral gutter and a 13 x 12 mm patellar chondral defect. (Id. at 469). Dr. Lane recommended revision surgery and later took Plaintiff off work based on Plaintiff's subjective report that he could not walk the distance from his car to his job. (Id. at 470). Plaintiff did not seek any further treatment from Dr. Lane, and there is nothing in Dr. Lane's treatment records that suggests that Dr. Lane's work restriction was meant to be permanent or that it was based on anything other than Plaintiff's subjective report.

Plaintiff was next treated by Dr. Pearsall who initially prescribed a brace and restricted Plaintiff from work in an effort to help alleviate Plaintiff's medial joint line symptoms.

Dr. Pearsall later performed a left knee video arthroscopy, synovectomy, and open patellar mosaicplasty with five plugs in January 2010. (Id. at 479). Dr. Pearsall also prescribed Ted hose, physical therapy, Lortab, and Mobic. By April 2010, Plaintiff's flexion in his left leg was up to 100 degrees although he reported difficulty walking and the need for a cane. (Id. at 482). Dr. Pearsall recommended an arthroscopy for scar resection. While awaiting approval from Plaintiff's Worker's Compensation provider for the recommended surgery, Plaintiff settled his Worker's Compensation claim for $125,000 and elected not to have the surgery because he would have to pay for it out of his settlement proceeds. At that point, Plaintiff discussed disability with Dr. Pearsall and was directed to provide the forms to Dr. Pearsall, who would evaluate and complete them. Interestingly, Dr. Pearsall's treatment notes do not contain any opinions or findings that Plaintiff is not capable of gainful employment, and the record is devoid of any disability forms completed by Dr. Pearsall.

Against this backdrop of evidence, the ALJ properly determined that the work restrictions offered by Dr. Lane and Dr. Pearsall were temporary and provided to Plaintiff while awaiting surgery or recovering from surgery and did not reflect permanent work-related restrictions by either physician. Thus, they do not support Dr. Harrison's opinions that Plaintiff

experiences debilitating pain such that he cannot maintain a forty-hour work week.

Further, Dr. Harrison's pain forms are not supported by the consultative evaluation by Dr. Crotwell or the testimony of Dr. Lorber, the medical expert who reviewed Plaintiff's medical records and testified at the second hearing. Unlike Dr. Harrison, both Drs. Crotwell and Lorber are orthopedists. As previously noted, Dr. Crotwell examined Plaintiff and found that Plaintiff had painful range of motion of the left knee at 110 degrees, and crepitus underneath the patella. He observed that Plaintiff moved about without much difficulty although he ambulated with a cane. He diagnosed Plaintiff with postoperative video of the left knee with some moderate arthritis of the knee and patellofemoral joint and postoperative open microfracture technique and mosaic technique for the patella with residual severe patellofemoral arthritis, considered moderate to severe. He opined that Plaintiff could still carry out an eight-hour work day performing sedentary jobs that did not involve excessive walking, inclines, stairs, bending, stooping, crawling, or excessive torqueing of the leg. These findings by Dr. Crotwell constitute substantial evidence supporting the ALJ's decision that Plaintiff is not disabled.

Dr. Lorber's testimony also constitutes substantial evidence in support of the ALJ's decision. Indeed, the ALJ

properly relied upon and assigned controlling weight to the opinions of Dr. Lorber, who reviewed Plaintiff's medical records, including those of Dr. Lane, Dr. Pearsall, and Dr. Harrison. He determined that, while Plaintiff has a severe left knee impairment, his condition does not rise to the listing level and does not render Plaintiff unable to work. Taking into account Plaintiff's severe left knee impairment, his obesity, and other ailments, Dr. Lorber found that Plaintiff can stand and walk, either singularly or in combination, for two hours a day for thirty minutes at a time. (Id. at 62). He also determined that Plaintiff has no sitting restrictions and is capable of lifting twenty pounds occasionally and ten pounds frequently. (Id.). The ALJ properly relied upon Dr. Lorber's testimony in formulating Plaintiff's residual functional capacity ("RFC").

In addition to finding that the ALJ had good cause to assign controlling weight to the opinions of Dr. Lorber and to discount the extreme restrictions opined by Dr. Harrison, the Court finds that Plaintiff has failed to show that any limitations caused by his impairments exceed the RFC and are not accommodated by the stated restrictions. Indeed, the record reflects that Plaintiff cares for his own needs, is able to move about without difficulty, has a driver's license and drives, attends church, and reported to Dr. Crotwell that he can walk

two to three blocks. (Id. at 114, 536). Further, it is noteworthy that Plaintiff has not sought treatment from an orthopedic specialist since 2010 and elected to forego a recommended scoping procedure despite receiving a sizable Worker's Compensation settlement. (Id. at 105, 474).

Based on the totality of the record, the Court finds that the ALJ's decision, including the weight assigned to the opinions of Plaintiff's treating physician and the RFC determination, is supported by substantial evidence.

## VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**DONE** this **27th** day of **September, 2017.**

_____
/s/ SONJA F. BIVINS
UNITED STATES MAGISTRATE JUDGE
